76 P.3d 519 (2003)
The PEOPLE of the State of Colorado, Complainant,
v.
Glenda Dodd GIFFORD, Respondent.
No. 03PDJ006.
Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.
September 3, 2003.

*520 REPORT, DECISION AND IMPOSITION OF SANCTION

Opinion issued by a Hearing Board consisting of the Presiding Disciplinary Judge ROGER L. KEITHLEY and Hearing Board Members JOHN M. LEBSACK and DOUGLAS D. PIERSEL, members of the bar.

SANCTION IMPOSED: ATTORNEY DISBARRED
A sanctions hearing pursuant to C.R.C.P. 251.15(b) was held on June 23, 2003, before a Hearing Board consisting of the Presiding Disciplinary Judge ("PDJ") and two Hearing Board Members, John M. Lebsack and Douglas D. Piersel both members of the bar. James C. Coyle, Deputy Regulation Counsel, represented the People of the State of Colorado (the "People"). Glenda Dodd Gifford, the respondent ("Gifford"), appeared on her own behalf.
On January 27, 2003, the People filed a Complaint in the above-entitled matter. Gifford, through counsel, filed an Answer on March 3, 2003. An at-issue conference occurred on March 27, 2003. Pursuant to the at-issue conference order, initial disclosures were required on or before April 7, 2003. The People filed their initial disclosures on April 1, 2003. Gifford failed to file initial disclosures. On April 10, 2003, the Colorado Supreme immediately suspended the respondent from the practice of law based upon some of the facts alleged in the Amended Complaint. On April 23, 2003, counsel for the respondent moved to withdraw. On April 29, 2003, the People filed a motion for order compelling discovery based upon Gifford's failure to provide initial disclosures. Gifford did not respond to the motion to compel. The PDJ entered an order compelling Gifford to file disclosures. Gifford did not comply with the PDJ's order. On April 30, 2003, the People filed an unopposed motion for leave to file an Amended Complaint and attached a copy of the proposed amended complaint. On May 1, 2003, the PDJ granted the People's unopposed motion for leave to file the Amended Complaint which was accepted for filing the same day. Gifford filed no response to her counsel's motion to withdraw and on May 8, 2003, the PDJ granted the motion to withdraw.
On May 15, 2003, the People filed a motion for default due to Gifford's failure to file an Answer to the Amended Complaint. Gifford neither responded to the People's motion for default nor filed an Answer to the Amended Complaint. On June 3, 2003, the PDJ issued an order granting the People's motion for default. Claims one, two, four, through fourteen, sixteen through twenty, twenty-two and twenty-three were deemed admitted. The People filed a motion to dismiss claim fifteen; that motion was granted on June 4, 2003. Claims three and twenty-one, asserted as alternative claims, were also dismissed.
A sanctions hearing was set in the above-entitled matter for June 23, 2003. At the sanctions hearing, the People's exhibits 1 through four, six and seven were admitted into evidence. On June 25, 2003, after the conclusion of the sanctions hearing, Gifford filed an unverified pleading captioned "Request for Consideration" seeking to place before the Hearing Board facts not presented at the time of the sanctions hearing. On July 8, 2003, Gifford filed an additional unverified pleading captioned "Motion for Leniency" again seeking to place additional facts before the Hearing Board not presented at the sanctions hearing. These two pleadings were considered by the Hearing Board as argument only. The Hearing *521 Board considered the exhibits, the facts established by the entry of default, and the parties' argument, and made the following findings of fact which were established by clear and convincing evidence.

I. FINDINGS OF FACT
Glenda Dodd Gifford has taken and subscribed to the oath of admission, was admitted to the bar of the Colorado Supreme Court on October 23, 1995, and is registered upon the official records of the Supreme Court, registration number 26058. She is subject to the jurisdiction of this court pursuant to C.R.C.P. 251.1(b).
All factual allegations set forth in the amended complaint were deemed admitted by the entry of default, and were therefore established by clear and convincing evidence. See the amended complaint attached hereto as Exhibit "A". The entry of default also deemed established the violations of the Rules of Professional Conduct set forth therein, except for two alternative claims asserting a violation of Colo. RPC 1.15(a) (claims three and twenty-one), and one claim asserting a violation of Colo. RPC 1.8(a) (claim fifteen). Claims three, fifteen and twenty-one were dismissed.

II. CONCLUSIONS OF LAW
In the Duran matter, the order entering default established that Gifford violated Colo. RPC 1.1 (a lawyer shall provide competent representation to a client), Colo. RPC 1.4(a) (a lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information), Colo. RPC 1.4(b) (a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation), Colo. RPC 1.15(c) (a lawyer shall keep disputed property separate until there is an accounting and severance of the disputed interest), Colo. RPC 1.15(g)(1) (a lawyer shall make a trust account withdrawal only by authorized bank or wire transfer or by check payable to a named payee, and not to cash), Colo. RPC 1.16(d) (upon termination, a lawyer shall take steps to protect a client's interest and surrender papers and property to the client), Colo. RPC 3.3(a)(1) (a lawyer shall not knowingly make a false statement of material fact or law to a tribunal), Colo. RPC 3.4(c) (a lawyer shall not knowingly disobey an obligation under the rules of a tribunal), Colo. RPC 3.4(d) (in pre-trial procedure, a lawyer shall not make a frivolous discovery request), Colo. RPC 3.4(e) (a lawyer shall not in trial assert personal knowledge of facts and issue except when testifying as a witness), Colo. RPC 4.2 (in representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so), Colo. RPC 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentationknowing conversion and other dishonesty), and Colo. RPC 8.4(d) (a lawyer shall not engage in conduct that is prejudicial to administration of justice).
In the Phillips matter, the order entering default established that Gifford violated Colo. RPC 1.1 (a lawyer shall provide competent representation to a client), Colo. RPC 1.2(d) (a lawyer shall not counsel a client to engage in conduct that the lawyer knows is criminal), Colo. RPC 1.16(d) (upon termination, a lawyer shall take steps to protect a client's interest and surrender papers and property to the client), Colo. RPC 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation), Colo. RPC 8.4(d) (a lawyer shall not engage in conduct that is prejudicial to administration of justice), and Colo. RPC 8.4(h) (it is professional misconduct for a lawyer to engage in any other conduct that adversely reflects on the lawyer's fitness to practice law).
In the Campanella-Kortobi matter, the order entering default established that Gifford violated Colo. RPC 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentationknowing conversion), Colo. RPC 1.16(d) (upon termination, a lawyer shall take steps to protect a client's interest and surrender papers and property to the client) and Colo. RPC 1.15(b) *522 (upon receiving funds or other property in which the client has an interest, a lawyer shall deliver to the client any funds or other property that the client is entitled to receive and, upon request by the client, render a full accounting regarding such property).
A review of these three client matters reveals the magnitude of Gifford's misconduct. In the Duran matter, Gifford misappropriated funds held in escrow for a parenting evaluation and applied them to an outstanding attorney's fee bill. Gifford took such funds knowing that ownership of said funds was in dispute between the parenting evaluator and the client. Gifford knew that neither the parenting evaluator nor the client had authorized her to take such funds, and knew that her client was in bankruptcy proceedings (which listed Gifford as a creditor) at the time she withdrew the funds. Through her unauthorized exercise of dominion or ownership over the entrusted funds, Gifford knowingly converted or misappropriated funds belonging to others. Gifford also knowingly converted client Marnie Campanella-Kortobi's retainer prior to earning such funds.
Gifford engaged in further acts of dishonesty, fraud, deceit and misrepresentation when she submitted false billing statements regarding her representation in the Duran matter to the Office of Attorney Regulation Counsel in October 2002. In addition, Gifford made a false statement of material fact to the district court in the Duran dissolution matter, and recorded false information contained in a notice and claim of lien filed with the Arapahoe County Clerk and Recorder's Office in the Phillips matter. Gifford also counseled her client in the Phillips matter to engage in conduct that Gifford knew was criminal in nature: offering real estate in exchange for a recantation of testimony by his ex-wife and another witness in a pending criminal matter. Gifford knew such conduct was illegal as she had previously discussed this issue with her client in August 2000 and had discouraged him from following that course of conduct at that time, and had specifically stated to the client at that time that she considered such conduct illegal.
Gifford also failed to provide her clients in the Duran and Phillips matters with competent legal representation on numerous occasions, including when she informed Duran and her mother that they would get all of their attorneys fees back by court order even if Gifford had to personally "put a padlock" on the husband's office and sell off his equipment; by violations of the Colorado Rules of Civil Procedure in the preparation and handling of subpoenas in the Duran matter; by filing a motion to compel discovery in the Duran matter without having made formal requests for discovery; and by issuing a "notice of paper deposition" to the opposing party in the Duran matter in lieu of complying with production of document requests under Rule 34; by failing to present evidence on attorney fees at the Duran dissolution hearing; by testifying during her cross-examination and direct examination of witnesses in several hearings in the Duran matter.
In all three client matters, Gifford failed to take steps to the extent reasonably practicable to protect each of these client's interests after she was terminated by failing to return client files, provide accountings or return unearned retainers. The record demonstrates that subsequent attorneys were forced to make numerous attempts to communicate with Gifford, and sometimes seek court intervention, in order to obtain client files prior to upcoming hearings.
Additional misconduct by Gifford included failure to communicate with her client in the Duran matter, writing a check to cash (in the amount of $64,424.75) from her trust account, communicating about the subject of the representation with a party Gifford knew was represented by counsel on two occasions in the Duran matter, and improperly recording a charging lien on real property in the Phillips matter.

III. SANCTION/IMPOSITION OF DISCIPLINE
The ABA Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) ("ABA Standards") is the guiding authority for selecting the appropriate sanction to impose for this lawyer's misconduct. ABA Standard 4.11 *523 provides that disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client. The presumed sanction for knowing conversion of client funds is disbarment. See People v. Varallo, 913 P.2d 1 (Colo.1996). Standing alone, the respondent's conduct in converting escrowed funds in the Duran matter, and client funds in the Campanella Kortobi matter, require disbarment. See People v. Varallo, 913 P.2d 1 (Colo.1996). On the date of the sanctions hearing, Gifford had not returned the converted funds.[1]
ABA Standard 4.41 provides that disbarment is generally appropriate when: a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client, or engages in a pattern of neglect with respect to client matters and causes serious of potentially serious injury to a client. Gifford's pattern of neglect in failing to return client files in all three matters caused injury to each of these clients. The injuries Gifford caused the clients were potentially serious.
Pursuant to ABA Standards 9.22 and 9.32, respectively, the Hearing Board considered aggravating and mitigating factors in arriving at the appropriate sanction. No mitigating factors were established other than absence of a prior disciplinary record, see id. at 9.32(a). The facts deemed admitted in the Amended Complaint established a dishonest or selfish motive, see id. at 9.22(b); a pattern of misconduct, see id. at 9.22(c); Gifford engaged in multiple offenses see id. at 9.22(d); she submitted false evidence during the disciplinary process see id. at 9.22(f), and Gifford demonstrated indifference to making restitution, see id. at 9.22(j).
Gifford's other dishonest actsincompetence, instances of failure to communicate, failure to properly handle client funds, failure to surrender property, failure to abide by the Colorado Rules of Evidence and Procedure, and mishandling of liensamongst other misconduct, reinforce the decision to impose the sanction of disbarment.

IV. ORDER
It is therefore ORDERED:
1. GLENDA DODD GIFFORD, attorney registration 26058, is DISBARRED from the practice of law effective 31 days from the date of this order.
2. Gifford is Ordered to pay the costs of these proceedings in the amount of $6,870.33, within 60 days of the date of this order.
3. Gifford is further ordered to reimburse the Colorado Attorney Fund for Client Protection the sum of $2,551.25, plus statutory interest from April 22, 2003, for its April 22, 2003, payment to client Amy Duran, within 30 days of the date of this order; and reimburse the same fund $1,242.10, plus statutory interest from April 22, 2003, for its April 22, 2003, payment to client Marnie Campanella Kortobi, within 30 days of the date of this order.

EXHIBIT "A"

COURT USE ONLY
James C. Coyle, # 14970, Deputy Regulation Counsel, John S. Gleason, # 15011, Regulation Counsel, Attorneys for Complainant, 600 17th Street, Suite 200-South, Denver, Colorado 80202.

COMPLAINT
THIS COMPLAINT is filed pursuant to the authority of C.R.C.P. 251.9 through 251.14, and it is alleged as follows:

Jurisdiction
1. The respondent has taken and subscribed the oath of admission, was admitted to the bar of this court on October 23, 1995, and is registered upon the official records of this court, registration no. 26058. She is subject to the jurisdiction of this court in these disciplinary proceedings. The respondent's registered business address is 621 17th Street, Suite 2210, Denver, Colorado 80202.

*524 General Allegations

THE JACK DURAN/JUANITA RICE/AMY SZOT/PATRICIA BEHRENS MATTERS
2. Jack E. Duran is an orthodontist. Dr. Duran and Amy Wallace began a relationship in Ohio and continued that relationship when they arrived together in Colorado in July/August 1996. Amy worked as an assistant in Dr. Duran's orthodontic business. The couple also had a daughter in the spring of 1998 (Jacklynn). Jack and Amy both referred to Amy as "Amy Duran" during the course of their relationship.
3. At some point in the summer of 1998, Jack Duran believed Amy was embezzling monies from the business. Several matters resulted, including: (a) a criminal complaint filed by Jack Duran against Amy; (b) an unemployment benefits matter involving Amy's employment with the business; (c) a dissolution of common law marriage action filed by Amy; and (d) a civil action for slander/defamation of character filed by Amy against Jack, Jack's father, and Jack's mother.
4. The respondent represented Amy in the dissolution matter and the unemployment compensation matter, and assisted Amy during the police investigation into potential criminal misconduct regarding the embezzlement allegations.
5. An attorney-client relationship was entered into on October 21, 1998, thereby forming an obligation on the part of respondent to perform the agreed-upon services. By agreeing to perform the requested services, the respondent inherently represented that she would provide the services in accordance with the Colorado Rules of Professional Conduct.
6. The client's mother, Patricia Behrens, paid the respondent's initial retainer. At an October 1998 meeting, the respondent informed her client and the client's mother that the mother would get all of her money back by court order even if the respondent had to personally "put a padlock" on Jack Duran's office and sell off his equipment.
7. On November 13, 1998, Amy Duran (by and through the respondent) filed a petition for dissolution of common law marriage against Jack Duran in In re the Marriage of Duran, case no. 98DR3077, Arapahoe County District Court. A domestic case management and delay reduction order was entered on that same date, requiring that the parties meet and attempt in good faith to resolve temporary orders, that the matter be submitted to some form of alternative dispute resolution, and that case management, disclosure and discovery be conducted in accordance with C.R.C.P. 16.2 and 26.2.
8. On December 1, 1998, Jack Duran filed his response, and denied that the parties were married at any time, and filed a counter-petition for custody of Jacklynn.
9. On December 10, 1998, Jack Duran, though attorney Amy Loper, filed a verified motion for determination of existence of common law marriage.
10. On December 17, 1998, a hearing on permanent orders before Judge Jack Smith was scheduled for October 18-20, 1999. On January 2, 1999, Judge Smith ordered that the matter of common law marriage also be heard on October 18-20, 1999. A hearing on temporary orders was scheduled for February 19, 1999.
11. On February 10, 1999, the respondent prepared and signed a subpoena to appear and produce documents that was directed to Jack Duran's father:
a. The subpoena directed the father to appear in division M of the Arapahoe County District Court on February 18, 1999 at 10:00 a.m. as a witness for Amy Duran (the subpoena instructed him to arrive at 9:45 a.m.).
b. The subpoena also directed the father to produce documents that might support his interest in his son's business, and that "support or refute" any claim that Amy may have embezzled funds from him, his son, or the business.
c. While there was a temporary orders hearing scheduled on February 19, 1999 at 2:30 p.m., there were no proceedings scheduled for February 18, 1999 in the dissolution matter.

*525 d. The subpoena was served upon Jack Duran (the son) at approximately 1:45 p.m. on February 17, 1999, and not upon the intended recipient of the subpoena.
e. No attendance or mileage fee was served with the document, and no notice was given to either attorney Loper or to Jack Duran's father regarding the subpoena or the February 18 event.
f. Furthermore, the respondent wrote the following on the face of the document: "failure to appear may result in your arrest."
12. On February 17, 1999, attorney Loper filed a joint motion to quash on behalf of her client and the client's father, requesting that the subpoena be quashed because the subpoenas were not served 48 hours before the time of appearance, and no court order was issued permitting the time to be shortened (C.R.C.P.45(c)); that the requisite attendance fee and mileage were not tendered with said subpoena (C.R.C.P.45(c)); that five days notice to opposing counsel was not provided, nor had the respondent made any effort to schedule the appearance at a time reasonably convenient to either the father, the son, or attorney Loper (C.R.C.P. 121, § 1-12(1)); and that the attempted service was made upon the son at his place of business, and not upon the father, and therefore personal service had not been achieved on the father (C.R.C.P.4(e)(1)). Furthermore, attorney Loper objected to the handwritten statement on the subpoena that stated "failure to appear may result in your arrest" as a "totally false threat given the invalidity of the attempted service."
13. On February 19, 1999, the first of three temporary orders hearings occurred. At that hearing, the parties stipulated that on an interim basis Amy would be the sole legal custodian of Jacklynn. The court accepted that stipulation and ordered that until a continued temporary orders hearing (scheduled for March 31, 1999) occurred, Amy would have sole legal custody of Jacklynn (Amy had relocated to Great Bend, Kansas).
14. The court also ordered Amy to immediately sign a release that had already been furnished by attorney Loper for Amy's First Bank account.
15. On March 12, 1999, Judge Smith entered an order quashing the respondent's February 10 subpoena, and granted the protective order and awarded attorney fees against Amy Duran and respondent Gifford. The court further ordered:
Petitioner and her counsel are ordered to desist from any further discovery which is not conducted in compliance with the Colorado Rules of Civil Procedure.
16. On March 15, 1999, attorney Loper filed a motion to compel discovery, requesting overdue responses to pattern interrogatories and pattern and non-pattern requests for production of documents, to compel Amy to comply with the mandatory disclosure requirements of C.R.C.P. 26.2(a), and to compel Amy to execute releases for her First Bank account. Prior correspondence amongst attorneys Loper and Gifford demonstrate that Gifford disputed whether the court had ordered Amy to sign the release regarding her bank account.
17. On March 18, 1999, interim temporary orders submitted by attorney Loper were made an order of court. An alternate form submitted by respondent Gifford was not approved.
18. On March 24, 1999, the respondent filed a response to attorney Loper's motion to compel discovery and also filed a "motion to compel discovery and motion to order (Jack Duran) to comply with orders of the court and motion for sanctions/attorney fees." In the response and motions, the respondent stated that the "First Bank release has been dealt with." This statement was false; no release had been signed for the bank account as of the date of said response. Instead, the respondent and her client had produced two months of statements on one account and the 1996 statements from another account. This limited production of documents was in violation of the prior court order that Amy immediately sign the release.
19. The respondent knew that the above statement contained in her response pleading *526 was false at the time she made such statement.
20. Respondent Gifford's March 24, 1999, motion to compel Jack Duran to provide discovery was not based on Jack Duran's failure to answer any formal discovery, but instead on a claim that documents informally requested had not been produced. Respondent failed to disclose this information to the court in her motion, but instead implied that formal requests were made pursuant to the Colorado Rules of Civil Procedure. The respondent's motion to compel thus did not comply with the Colorado Rules of Civil Procedure.
21. On March 29, 1999, the respondent filed a motion for continuance of the March 31 temporary orders hearing, and as grounds therefore stated that the respondent fell and injured herself at the Jefferson County Courthouse. The motion was granted, and the continued temporary orders was set for May 12, 1999.
22. On April 7, 1999, Judge Smith entered an order deferring the motions to compel filed by both parties to "the [October 18-20, 1999] hearing, in anticipation that counsel will understand their respective obligations and convey them to their respective clients." No further action was taken by Judge Smith on these outstanding motions prior to the October 18-20, 1999 hearing.
23. Despite the prior March 12, 1999 court order regarding respondent Gifford's February 10 subpoena, on April 21, 1999, the respondent Gifford again attempted to serve a subpoena on Jack Duran's father (this time, for the May 12, 1999 temporary orders hearing):
a. The respondent did not, however, attempt to personally serve the father at his home in Ignacio, Colorado; instead, the respondent served the son's business.
b. The respondent failed to tender the proper attendance fee and mileage for the father.
c. Finally, the subpoena requested the son's orthodontic business records and appointment book and records for patients, and thus information outside the control of the father and that could be subject to Jack Duran's assertion of a doctor/patient privilege.
24. On April 26, 1999 opposing counsel Loper requested that the respondent cease communicating directly with Jack Duran on matters involving either the dissolution proceeding or the unemployment compensation hearing.
25. On Wednesday, May 12, 1999, a second interim temporary orders hearing occurred. The magistrate again referred to its previous order that Amy Duran sign a release for the First Bank account. The court noted that Amy Duran had not signed the release. The court ordered the Amy Duran sign the release immediately and deliver it to attorney Loper before the end of the day on May 12, 1999.
26. Temporary orders were not completed on May 12, 1999 and were thus continued to and concluded on August 3, 1999.
27. On August 13, 1999, respondent Gifford faxed and mailed a "notice of "paper" deposition" to attorney Loper:
a. The respondent was requesting production of business records, bank records and personal records, presumably from the opposing party Jack Duran and his orthodontic practice (the notice of paper deposition did not indicate to whom it was addressed). There is no provision for such a paper deposition in the Colorado Rules of Civil Procedure. Jack Duran was a party to the proceeding and thus the Colorado Rules of Civil Procedure concerning production of documents applied. This notice of paper deposition did not comply with the rules.
b. Also the date of the paper deposition (August 20 at 9:30 a.m.) was not scheduled beforehand with attorney Loper, as required pursuant to C.R.C.P. 121 § 1-12.
On August 18, 1999, attorney Loper filed a motion for protective orders against the August 13, 1999, subpoena.
28. On August 23, 1999, respondent Gifford filed a motion for forthwith telephone hearing for restraining order and other appropriate relief, alleging that Jack Duran had *527 been harassing Amy Duran through telephone communications.
29. On August 24, 1999 attorney Loper filed a response on behalf of Jack Duran and asserted that the motion was an attempt to circumvent the August 20, 1999, temporary orders regarding parenting time.
30. On August 26, 1999 and after a telephone hearing, the magistrate denied respondent Gifford's motion, finding "no evidence, direct, circumstantial or otherwise to prove the allegations made."
31. On August 26, 1999, respondent had a subpoena duces tecum served on Jack Duran:
a. The respondent had the subpoena served without any notice to Dr. Duran's counsel, attorney Loper.
b. The subpoena required the production of an extensive list of documents on September 1, 1999.
c. This subpoena again circumvented the procedures by which one party may obtain documents from another party (C.R.C.P. 34).
On August 30, 1999, attorney Loper filed a motion to quash the most recent subpoena duces tecum and for protective orders and for sanctions.
32. On September 23, 1999, respondent Gifford issued a subpoena to Dr. Efren Martinez for a deposition on October 1, 1999:
a. Respondent Gifford made no attempt to give attorney Loper notice that the deposition was going to occur, in violation of C.R.C.P. 30(b)(1) and C.R.C.P. 121, § 1-12.
b. The permanent orders hearing was scheduled for October 18, 19 and 20, 1999, and pursuant to C.R.C.P. 16.2(c) discovery was to be completed not less than 30 days before a hearing; the respondent had not sought an extension of time for this deposition.
c. Dr. Duran and attorney Loper learned of the subpoena only when Dr. Martinez contacted Dr. Duran.
On September 27, 1999, attorney Loper filed a motion for protective orders on said subpoena.
33. Also on September 23, 1999, respondent Gifford subpoenaed Lynn Kernan to appear and produce documents on October 1, 1999:
a. Again, the respondent did not attempt to clear the October 1, 1999, date with Dr. Duran's counsel nor did she provide Dr. Duran's counsel notice of the deposition. This violates C.R.C.P. 30(b)(1) and C.R.C.P. 121, § 1-12.
b. Such conduct also violated C.R.C.P. 16.2(c) as discovery was to be completed not less than 30 days before the October 18 20 hearing, and no motion for extension of discovery period was filed.
Again, attorney Loper filed a motion for protective order for these violations.
34. On October 16, 1999 the respondent accompanied her client to a parenting exchange event at a local McDonalds:
a. Opposing counsel was not present.
b. At that time, the respondent talked to Dr. Duran about several matters concerning the subject of the representation, including: her inability to have delivered certain documents, whether Duran would be willing to provide her client Bronco tickets for the next day, the availability of his attorney over the weekend, and a visitation issue. These statements concerned the subject of attorney Loper's representation of Dr. Duran.
c. The incident was videotaped by Dr. Duran. The next day, Attorney Loper again wrote to the respondent (see paragraph 24 above), admonishing her to refrain from contacting Dr. Duran.
35. The permanent orders hearing occurred on October 18-20, 1999. The court entered its orders on Friday, October 22, 1999. The court found that there was a common-law marriage between the parties. Amy Duran was awarded sole custody of the child, with visitation in Kansas for the father. The court also notified the parties that a special representative would be appointed for the child. Marianne Tims was appointed as the child's representative.
36. Hearing on the remaining issues for permanent orders was set for March 15, 2000. On March 4, 2000 Tims filed her report *528 and made recommendations to the court.
37. After concluding the March 15, 2000 hearing, and on March 17, 2000, the court found the marriage irretrievably broken, and made further orders regarding child visitation and division of property. Despite respondent's assurances to her client and the client's mother throughout the representation, the respondent failed to present evidence on attorney fees. The court did not award any attorney fees because the court found it had already placed the parties on an equal footing.
38. The respondent Gifford filed a post-hearing motion on behalf of her client, asking that the court reconsider its position on several issues, including the failure to award attorney fees. Attorney Loper filed a response that stated that in addition to the court's rationale on the attorney fee issue, respondent Gifford "completely failed to provide any evidence or testimony related to the amount of her fees, the reasonableness of her fees, and her rationale for why any portion of those fees should be borne by [Jack Duran]." The respondent Gifford's motion for reconsideration on the attorney fee issue was denied.
39. Subsequently, and on April 25, 2000 Hillary D. Lipton ("Lipton") became the court-appointed child's representative. Lipton was to report on compliance issues concerning parenting classes, the visitation plan and expansion of such visitation. Periodic court hearings were also scheduled to ensure compliance. The first review hearing occurred on October 2, 2000.
40. At some point in 2000, the respondent Gifford instructed her client not to communicate with the child's representative. This caused great difficulty for everyone involved, and both the child's representative (Lipton) and the client Amy Duran, believe many of the messages provided by each through the respondent were never received by the other.
41. Judge Juanita L. Rice became the presiding judge on this matter on or about January 3, 2001.
42. On January 19, 2001, the child's representative filed a motion for emergency telephone hearing due to Amy Duran's attempt to cancel a previously scheduled parenting time for Jack on January 20-21, 2001.
43. On January 24, 2001, Lipton filed a motion for issuance of contempt citation against Amy Duran. The motion alleged violations of the court-ordered parenting time between the child and Jack Duran in Kansas. Ms. Lipton's report also noted difficulties in communicating with respondent Gifford:
On January 19, 2001 ... the child's representative attempted by motion for emergency hearing to avoid the cancellation of the visit by the petitioner, however, the petitioner and her counsel refused to make themselves available for this hearing.... Petitioner's counsel stated to the office of the undersigned that she does not work on Fridays and was unclear of what the issue was or what this `was about' (despite the petitioner's indication that her counsel was to be preparing `a letter' to the parties of the petitioner's intent to not allow parenting time on January 20 and 21 because she would be attending a wedding in Kansas City.... Petitioner's counsel indicated that she would not be available for this case because she did not work on Fridays and was to attend a settlement conference on another case and was not willing to provide any time during the remainder of the day for the 15 minute telephone hearing.... (emphasis added).
A citation to show cause was issued by the court, and a hearing was set for February 22, 2001.
44. Amy Duran failed to personally appear for the February 22, 2001 contempt hearing date. The court set April 17, 2001 as a new date for the contempt matter, and again ordered Amy to be present. A contempt hearing occurred on that date. At that hearing, and while Amy Duran was on the witness stand, the respondent provided a response to her client on a question posed by attorney Lipton. When attorney Lipton asked: "Would it surprise you that Gail Edwards believes you're pushing autism on Jacklynn?", the client testified "I don't think *529 that's adequate," and the respondent then stated in open court the word: `accurate.'" The following exchange then occurred:
THE COURT: Ms. Gifford.
MS. GIFFORD: She's said adequate. I said accurate.
THE COURT: Ms. Gifford, how could you do that?
THE WITNESS: I didn't mean.
MS. GIFFORD: Your Honor.
THE COURT: I don't care what she said.
MS. GIFFORD: I apologize.
THE COURT: You know that's wrong.
MS. GIFFORD: Well, Your Honor, we're trying to get through this.
THE COURT: Oh, that's not an excuse for a lawyer giving an answer and you know it.
MS. GIFFORD: She just said adequate and the word was accurate.
THE COURT: No. No. You know better. I don't want to ever hear that.
MS. GIFFORD: I'm sorry.
45. On September 4, 2001, the court agreed that the parenting time expansion was to include overnights with Jack Duran. The child's representative prepared a tentative schedule for the upcoming three months. The child's representative forwarded the proposal to the parties on September 5, 2001.
46. Respondent Gifford responded with a number of restrictions beyond the times of the visit (which was the only issue left for the stipulation). In a letter dated September 25, 2001, the respondent Gifford advised that contrary to court orders, the visits would be supervised or would be cancelled by the petitioner.
47. At a subsequent parent visitation in Kansas, and in front of a police officer and the minor child, Amy Duran because upset and assaulted Jack Duran. Amy Duran was arrested at the scene and charged with battery. As a result, on October 30, 2001, the child's representative requested a forthwith hearing on the matter.
48. A forthwith hearing occurred on November 8, 2001 before Judge Juanita Rice. A video of the incident was reviewed at the hearing; the video demonstrated that Ms. Duran was speaking to the respondent on the phone at the time Ms. Duran assaulted Jack Duran. The matter was continued until November 20, 2001 and Amy Duran was ordered to appear.
49. On November 8, 2001, Amy Duran by and through the respondent filed a motion for parenting time evaluation. The motion requested that either Dr. Claire Poole or Dr. Jean LaCrosse be appointed to conduct the evaluation.
50. Other hearings occurred on November 20, 2001 and December 5, 2001. The other attorneys involved in the matter and Judge Rice state that, at any hearing (from April, 2001 to the present) that Ms. Duran testified, the respondent would supply responses by shaking or nodding her head, or would provide a verbal answer to her client. Judge Rice and the other attorneys also state that the respondent would become very emotional at some of these hearings and would sometimes weep.
51. Amy Duran married Anthony Szot in December 2001.
52. On December 31, 2001 Judge Rice appointed Dr. Jean LaCrosse, Ph.D. to do the parenting time evaluation in the matter.
53. On January 11, 2002, Amy Szot was arrested for a felony theft charge, as well as for failure to appear on another matter. This conduct required another hearing before the court on January 22, 2002.
54. On January 22, 2002, and after the court hearing, the respondent accompanied her client to another parenting exchange:
a. The respondent, Amy Szot, and Amy's new father-in-law came to Dr. Duran's home. Dr. Duran came out the door with the minor daughter, Jacklynn.
b. At that time, the respondent stated, "I am going to examine this child."
c. The respondent then started to lift up the coat and shirt and pant leg; and then had the child turn around for further inspection, to look to see if Jacklynn had any bruises, etc.

*530 d. It was a cold day. Even the client was bewildered by the respondent's apparent need to examine the child.
e. This conduct was outside of the presence of Jack Duran's attorney and without authorization.
f. The respondent's statements were a challenge to Dr. Duran's parenting, and concerned the subject of representation.
g. The respondent's conduct was of a harassing and demeaning nature.
55. Amy was responsible for the payment of the parenting time evaluation. At some point, Amy provided Dr. LaCrosse with a check for $2,500 that was returned because of insufficient funds.
56. On March 29, 2002, Dr. LaCrosse informed the respondent, attorney Sean Virnich (another lawyer in Loper's firm representing Jack Duran) and the child representative Lipton, of the NSF check. Dr. LaCrosse informed the parties that she would cease all work on the case until the financial situation had been rectified to her satisfaction. As a result, a previously scheduled March 29 appointment with Jacklynn and her father (where Dr. LaCrosse would have an opportunity to see them for an extended time) was cancelled.
57. On March 29, 2002, Dr. LaCrosse received $2,500 via Federal Express from Amy and her family.
58. Dr. LaCrosse confirmed the receipt of the other $2,500 in a letter dated March 29, 2002. In that letter, Dr. LaCrosse further stated:
Unfortunately, the events in this particular case have created substantial question about Amy's ability and/or willingness to pay for the court ordered evaluation. Rather than risk being `stiffed' for my work in this matter, I am going to require that funds adequate to cover my estimated future work in this matter be guaranteed. Perhaps they can be provided to me. Perhaps they can be held by her attorney. Perhaps they can be provided to the court. Enclosed is my current itemization of accomplished workand estimated future workin this case. You will note that I am requesting that $8,000 in guaranteed funds be provided.
Dr. LaCrosse provided a statement that demonstrated $742.50 of the $2,500 deposit remained, and estimated additional time to explain why a further "guaranteed reserve of $8,000" needed to be provided.
59. On that same date (March 29, 2002), respondent Gifford wrote a letter to Dr. LaCrosse. The respondent informed Dr. LaCrosse that Amy was forwarding to her trust account an additional $8,000 to be received by April 7, 2002. The respondent further stated:
"If the above method of payment is acceptable, I will provide you with a copy of the deposit into my Lawyer's Trust Account once I have received it. I directed Amy to send it to me in "good funds" (certified/cashier's check, etc.).
60. On about April 8, 2002, the respondent received $8,000 from Amy Szot's family. These funds were deposited into the respondent's COLTAF account on April 22, 2002.
61. During April, 2002, the respondent spoke with Dr. LaCrosse on several occasions and attempted to present her client's case to Dr. LaCrosse. The respondent also wrote a five page letter to Dr. LaCrosse, again asserting her client's position regarding Jack Duran's conduct over the past several years.
62. On April 22, 2002, Amy Szot filed for bankruptcy. The respondent had been aware of Amy's efforts to file bankruptcy. The respondent was listed as a creditor in the bankruptcy for attorney fees owed.
63. On April 26, 2002, Dr. LaCrosse issued her report and recommendations to Judge Rice. In that letter, Dr. LaCrosse confirmed:
... Ms. Gifford has assured me, on several occasions, that she is holding an additional $8,000 in guaranteed reserve for me, which I requested after discovering Amy had given me a bad check.
Dr. LaCrosse also informed the judge that the case was difficult because respondent attempted to interject herself in the matter by providing "persuasive" input. The LaCrosse report was extensive (62 pages in *531 length) and recommended change of custody to the father, Jack Duran.
64. On May 1, 2002, a meeting among the parties occurred:
a. Dr. LaCrosse requested $5,448.75 for her work performed as of that date on the evaluation.
b. The respondent provided a COLTAF account check (# 1151), in the amount of $5,448.75 to Dr. LaCrosse.
c. As a result, $2,551.25 remained in the COLTAF account earmarked for payment to Dr. LaCrosse's evaluation.
d. The respondent informed the parties at the meeting that this remaining amount was still in her trust account and available for LaCrosse's testimony at the May 8-9, 2002, hearing.
65. On May 8, 2002, a hearing in front of Judge Rice occurred:
a. At the hearing, the respondent suggested answers to her client, while her client was on the stand testifying, by shaking or nodding her head during the testimony.
b. The respondent also testified during her cross-examination and direct-examination of witnesses. Judge Rice was required to admonish the respondent approximately nine times not to testify and told the respondent that if she became a witness, she would changing roles in the matter.
c. At the conclusion of the hearing, sole custody of the child Jacklynn was awarded to Dr. Duran.
66. On May 9, 2002, Dr. LaCrosse sent the respondent another billing statement for her time spent in preparation for the hearing and for her testimony at the hearing. These charges amounted to $2,300:
a. The respondent did not pay these charges, and did not respond to Dr. LaCrosse regarding such billing.
b. The respondent has produced a "July 31, 2002" billing statement (first provided to the Office of Attorney Regulation Counsel on October 7, 2002); that billing statement has an entry for May 9, 2002 that she "advised client [that she] would apply balance inretainer (sic) on her bill in accordance with our previous discussions."
c. The respondent's above statement contained in her "July 31, 2002", billing was false. The client did not give the respondent permission to apply the remainder to her attorney fees. The client states that at some point in May the respondent agreed to return the $2500 so that the client could use the money for the supplemental evaluation and a HARE test. The client did not receive the "July 31, 2002" billing statement until it was provided to her by the Office of Attorney Regulation Counsel in October, 2002.
67. After the May 8-9, 2002 hearing, Amy Szot decided that she may need to hire another attorney to represent her. Ms. Szot contacted attorney Bette K. Bushell.
68. On May 13, 2002, attorney Bushell contacted the respondent by letter. Ms. Bushell wanted to meet with the respondent and review the file. Ms. Bushell asked the respondent to contact her immediately so that she could do a proper investigation prior to the next hearing scheduled for July 17, 2002, and noted that supplemental parenting evaluations often take as long as 90 days; thus time was of the essence.
69. The respondent received this letter. Nevertheless, the respondent failed to respond to Ms. Bushell's letter and failed to provide access to the client file.
70. On May 14, 2002, the respondent wrote a check on her trust account and to "cash" for $64,424.75. This money was then turned into a cashier's check and provided to another client (Showendaller). $551.25 of this money was part of the disputed Duran/LaCrosse funds. The respondent states that this $551.25 error occurred due to an incorrect interest calculation for client Showendaller.
71. On May 22, 2002, the respondent provided her former client with a copy of Dr. LaCrosse's billings for the client's review. Also on May 22, 2002, Dr. LaCrosse wrote to the respondent requesting immediate attention to payment of the bill. The respondent sent a facsimile transmission to Dr. LaCrosse telling her that she had forwarded her invoices to Amy for her review, and that Amy *532 would "voice her concerns" to [Dr. LaCrosse] by the end of the next week.
72. On May 28, 2002, Amy notified respondent Gifford in writing that respondent should not pay Dr. LaCrosse any monies left in the trust account. Amy further stated, "As you know, I am in the process of filing bankruptcy." Amy also asserted that Dr. LaCrosse may have forced her to be in violation of bankruptcy law by forcing her to pay for the evaluation.
73. On May 29, 2002, Amy wrote respondent Gifford another letter (dated May 28, 2002) informing respondent Gifford that the respondent was "not to remove [the money remaining in her trust account] under any reason upon instructions from the mental health board." (emphasis added). $2,000.00 of the $2,551.25 was still in the respondent's COLTAF account on this date.
74. The respondent knew Dr. LaCrosse believed $2,300 of these funds belonged to her, and that Amy Szot believed the funds needed to stay in the respondent's COLTAF account.
75. On May 29, 1999, Dr. LaCrosse notified Judge Rice of her difficulties in receiving the remaining $2,300 in charges from the respondent for her expert witness fees. Dr. LaCrosse provided Judge Rice with a copy of her invoice, her May 9 letter to the respondent, and her May 22 letter to the respondent. Judge Rice forwarded these documents to the Office of Attorney Regulation.
76. On May 29, 2002, Amy's mother, Patricia Behrens, wrote to the respondent and requested an accounting of all fees paid to her on behalf of Amy Szot. Ms. Behrens also requested all billing statements since 1998 to the present. Ms. Behrens requested this information on or before June 3, 2002. The respondent received this request. The respondent did not respond to Ms. Behrens' letter, and did not provide an accounting or billing statements.
77. On June 11, 2002, the respondent filed a motion to withdraw from the dissolution matter. An order granting the motion to withdraw was entered July 9, 2002.
78. On June 21, 2002, the respondent transferred the remaining $2,000 of those funds held in escrow for the LaCrosse evaluation to her operating account for payment of outstanding attorney fees owed by Amy;
a. The respondent did so knowing that ownership of said funds was in dispute by Dr. LaCrosse and the client, knowing that the client had not authorized her to take such funds, and knowing that Amy Szot was in bankruptcy proceedings which listed the respondent as a creditor.
b. The respondent did not notify her client, Dr. LaCrosse, the bankruptcy court or the district court of her taking this money.
79. On June 21, 2002 attorney Bushell filed an entry of appearance on behalf of Amy Duran. Attorney Bushell also requested that the district court order a supplemental Parenting Plan Evaluation by William Dahlberg, M.D., additional depositions, and clarification of the court's May 9, 2002 order on visitation and parenting responsibility issues.
80. Also on June 21, 2002 attorney Bushell again wrote to the respondent, requesting an appointment to pick up the files that week. The respondent failed to respond to Ms. Bushell's June 21, 2002 letter.
81. Subsequently attorney Bushell made multiple attempts to reach respondent at her office and on her cellular telephone. The respondent did not answer, and attorney Bushell could not leave a voicemail message because the respondent's voice mail boxes were full.
82. On July 6, 2002 attorney Bushell wrote by facsimile transmission to the respondent. Bushell reminded the respondent of the July 17 hearing date. Bushell again requested immediate release of the client files. The respondent received this correspondence. The respondent did not respond.
83. On July 8, 2002 attorney Bushell sent another letter to the respondent by facsimile transmission. Bushell again related attempts to telephone respondent, and an attempt to visit the respondent. Bushell demanded immediate release of the file. The respondent received this letter.
*533 84. The respondent's July 31, 2002 billing statement contains the following entry for 7/8/02: "Advised Ms. Bushell our firm would be claiming the $2500 in our trust act per permission from Amy, but would get the 12 boxes together, keeping some necessary and attorney-client documents (sic)." This statement was false. (In fact the respondent had already withdrawn these funds).
85. On July 11, 2002 attorney Bushell received seven boxes of the files from the respondent. The respondent kept three boxes, saying she needed to review them for work product and "other private attorney matters," and would personally deliver them to the Bushell's office. Despite this assurance, the respondent failed to deliver these materials. None of the seven boxes that were provided that day contained any pleadings.
86. On July 15, 2002, Amy requested the remainder of her money held in the escrow account, which she believed to be around $2,500. Amy requested that the respondent provide those funds by July 19, 2002. The respondent received this request. The respondent did not provide those funds, and did not respond to Amy's request.
87. On July 16, 2002, attorney Bushell again sent a letter to the respondent by facsimile transmission demanding the remaining files before noon the next day. The respondent Gifford responded by letter on July 17 and in that letter stated to attorney Bushell that she could pick up the files at any time. The July 17 letter appears to have been sent by regular mail.
88. On July 17, 2002, in the afternoon, a review hearing occurred before Judge Rice. The matter had to be continued due to attorney Bushell's inability to retrieve pleadings and other crucial documents from the respondent.
89. Attorney Bushell retrieved the remaining files from the respondent's office on July 26, 2002.
90. On July 29, 2002, Amy again wrote to the respondent seeking the $2,500 left in the escrow account. Amy requested that the respondent provide her this money by August 2, 2002. The respondent did not respond to Amy's request and did not tell Amy that she had already taken these funds.
91. On August 16, 2002, attorney Bushell requested return of the $2500 to the client. The respondent said she intended to keep the money for her own use. The respondent has not returned these funds to the client, nor has she provided them to Dr. LaCrosse as intended.
92. On October 7, 2002, the respondent provided to this office a billing statement dated July 31, 2002 (discussed hereinabove). This office forwarded the billing statement to Ms. Szot.
93. The totality of the respondent's billings to the client are as follows: November 30, 1998; February 15, 1999; October 15, 1999; August 31, 2000; and the "July 31, 2002" billing statement provided in October, 2002. Prior to May 2002, the respondent collected over $56,000 from Ms. Szot and her mother upon request and without accountings for her time.

CLAIM I

[A Lawyer Shall Provide Competent Representation to a Client Colo. RPC 1.1]
94. Paragraphs 1 through 93 are incorporated herein.
95. Colo. RPC 1.1 provides that a lawyer shall provide competent representation to a client, and that competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.
96. The respondent failed to provide her client competent legal representation in the following respects:
a. By her statements made at the October 1998 meeting with her client and the mother when she informed them that the mother would get all of her money back by court order even if the respondent had to personally "put a padlock" on Jack Duran's office and sell off his equipment;
b. By her violations of the Colorado Rules of Civil Procedure in the preparation and handling of the February 10, 1999 *534 subpoena to appear and produce documents directed to Jack Duran's father;
c. By her failures over a period of three months to obtain the client's signature for a release as ordered by the court for Amy Duran's First Bank months, despite the court's February 19, 1999 order that it be handled "immediately.";
d. By her statements in her response to the motion to compel discovery that the "First Bank release has been dealt with," when it had not;
e. By her filing a motion to compel discovery against Jack Duran without having made formal requests for discovery pursuant to the Colorado Rules of Civil Procedure;
f. By her violations of the Colorado Rules of Civil Procedure in the preparation and handling of the April 21, 1999 subpoena directed to Jack Duran's father;
g. By her violations of the Colorado Rules of Civil Procedure in the preparation and handling of the August 13, 1999 notice of paper deposition involving Jack Duran;
h. By her preparation and handling of the August 23, 1999 motion for forthwith telephone hearing for restraining order and other appropriate relief, and by her conduct at the August 26, 1999 telephone hearing, when she presented no evidence direct, circumstantial or otherwise to prove the allegations made in said motion;
i. By her violations of the Colorado Rules of Civil Procedure in her preparation and handling of the August 26, 1999 subpoena duces tecum involving Jack Duran;
j. By her violations of the Colorado Rules of Civil Procedure in her preparation and handling of the September 23, 1999 subpoena involving Dr. Martinez;
k. By her violations of the Colorado Rues of Civil Procedure in her preparation and handling of the September 23, 1999 subpoena involving Lynn Kernan;
l. By her conduct at the October 16, 1999 parenting event;
m. By her failure to present evidence on attorney fees at the March 15, 2000 hearing;
n. By her instructions to her client not to communicate with the child's representative, creating difficulty and confusion for both her client and the child's representative;
o. By her providing a response to her client and all others present on a question raised by attorney Lipton to the client on the witness stand at the April 17, 2001 hearing;
p. By her adding restrictions that had not previously been agreed to or ordered by the court in her letter dated September 25, 2001;
q. By her supplying responses to her client on the witness stand by shaking or nodding her head or providing verbal answers to her client at other hearings from April 2001 through May 2002;
r. By her conduct at the January 22, 2002 parenting time event;
s. By her conduct in interjecting herself into Dr. LaCrosse's parenting evaluation process;
t. By her testifying during her cross-examination and direct-examination of witnesses at the May 8, 2002 hearing;
u. By her conduct in failing to provide the client file upon her termination, or otherwise protect her client's interests;
v. By her failure to provide the client with billing statements in a timely manner during the course of her representation; and
w. By remaining the attorney of record for the client despite lacking the necessary knowledge, skill, thoroughness and preparation reasonably necessary for such representation.
Each of these failures by the respondent constitutes a separate incident of failure to provide competent legal representation, as do all of them together.
97. The respondent knew or should have known that she was failing to provide competent legal representation to this client, but made no effort to remedy the situation.
*535 98. The respondent's failure to provide competent legal representation to the client caused injury or potential injury to the client.
99. By such conduct, the respondent violated Colo. RPC 1.1.
WHEREFORE, the complainant prays at the conclusion hereof.

II. CLAIM II

[A Lawyer Shall Keep a Client Reasonably Informed About the Status of a Matter, Promptly Comply With Reasonable Requests for Information, and Explain a Matter to the Extent Reasonably Necessary to Permit the Client to Make Informed Decisions Regarding the Representation-Colo. RPC 1.4(a) and (b)]
100. Paragraphs 1 through 93 are incorporated herein.
101. Colo. RPC 1.4(a) provides that a lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
102. This respondent failed to keep the client reasonably informed about the status of the legal matter and failed to comply promptly with reasonable requests for information in the following respects:
a. By failing to communicate adequately with the client concerning her time spent on the client matter, and by failing to provide regular and timely billing statements;
b. By failing to respond in timely fashion to the requests to review the file or produce the file made by the client and subsequent attorney Bette Bushell;
c. By failing to notify the client that she intended to dishonor the client's request that the remaining money held in her trust account was not to be removed upon under any reason;
d. By failing to notify the client that the respondent intended to withdraw the escrow funds remaining in her trust account and apply said funds for payment of outstanding attorney fees; and
e. By failing to account for said escrow funds after repeated client requests.
Each of these failures to communicate adequately with the client constitutes a separate violation of Colo. RPC 1.4(a) as do all of them together.
103. The respondent knew or should have known that her failure to communicate adequately with her client or the subsequent lawyer extended over a period of months (May, June, and July, 2002).
104. The respondent's pattern and practice of failing to communicate with the client caused injury or potential injury to the client.
105. Colo. RPC 1.4(b) provides that a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.
106. The respondent failed to explain to the client the matter in which the client was involved to the extent reasonably necessary to permit the client to make informed decisions in the following respects:
a. By failing to explain sufficiently to the client or her mother in October 1998 the court rules concerning attorney fees in dissolution matters, and the evidence that must be established to obtain attorney fees in such matters; and
b. By failing to explain sufficiently to the client the consequences of not talking to the child representative.
107. The respondent's failure to explain these issues caused injury or potential injury to the client.
108. By such conduct, the respondent violated Colo. RPC 1.4(b).
WHEREFORE, the complainant prays at the conclusion hereof.

III. CLAIM III

[Alternative Claim to Claim XIFailure to Keep Client or Third Party Funds Separate From the Lawyer's Own Property and Negligent Conversion of Client or Third Party Funds-Colo. RPC 1.15(a)]
109. Paragraphs 1 through 93 are incorporated herein.
*536 110. Colo. RPC 1.15(a) provides that an attorney is required to hold the property of clients or third persons that is in an attorney's possession separate from the attorney's own property.
111. By paying the disputed client or third party funds to herself and removing them from the COLTAF account, the respondent failed to keep client or third party funds separate from her own property.
112. The respondent did not have the consent of the client or anyone else in a position of authority to use any of the funds she removed from the COLTAF account.
113. The respondent exercised unauthorized dominion or ownership over these funds belonging to a client or third party.
114. By exercising unauthorized dominion or ownership over client or third party funds, the respondent negligently converted and/or misappropriated such funds prior to them being earned.
115. By such conduct, the respondent violated Colo. RPC 1.15(a).
WHEREFORE, the complainant prays at the conclusion hereof.

CLAIM IV

[Failing to Keep Disputed Property Separate Until There is an Accounting and Severance of the Disputed Interest-Colo. RPC 1.15(c)]
116. Paragraphs 1 through 93 are incorporated herein.
117. Rule 1.15(c), Colorado Rules of Professional Conduct, provides: "When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved."
118. The respondent was in possession of property in which the respondent, Dr. LaCrosse, and the client claimed an interest.
119. The respondent did not provide an accounting and severance of the interests, and made no other attempt to resolve such issues.
120. The respondent violated her obligation to keep such disputed funds separate and in her COLTAF account until the dispute between the client, Dr. LaCrosse and the respondent was resolved. Instead, the respondent applied those disputed funds to her outstanding fee bills.
121. By such conduct, the respondent violated Colo. RPC 1.15(c).
WHEREFORE, the complainant prays at the conclusion hereof.

CLAIM V

[Failure to Make a Trust Account Withdrawal Only by Authorized Bank or Wire Transfer or by Check Payable to a Named Payee, and Not to Cash-Colo. RPC 1.15(g)(1)]
122. Paragraphs 1 through 93 are incorporated herein.
123. Colo. RPC 1.15(g)(1) provides that all trust account withdrawals shall be made only by authorized bank or wire transfer or by check payable to a named payee and not to cash.
124. On May 14, 2002, the respondent wrote a check on her trust account and to "cash" for $64,424.75 in direct contravention of Colo. RPC 1.15(g)(1).
125. By such conduct, the respondent violated Colo. RPC 1.15(g)(1).
WHEREFORE, the complainant prays at the conclusion hereof.

CLAIM VI

[Upon Termination, a Lawyer Shall Take Steps to Protect a Client's Interest and Surrender Papers and Property to the Client-Colo. RPC 1.16(d)]
126. Paragraphs 1 through 93 are incorporated herein.
127. Colo. RPC 1.16(d) provides that upon termination of representation, a lawyer shall take steps to the extent reasonably *537 practicable to protect a client's interest, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled, and refunding any advance payment of fee that had not been earned.
128. The respondent knew and understood that Amy Duran was attempting to find another lawyer to replace her. The respondent knew and understood that time was of the essence in her client's custody battle. The respondent knew and understood that the respondent had an obligation to protect her client's interest.
129. Attorney Bette Bushell made requests for the client's files from the respondent.
130. The client made requests for the client's files from the respondent.
131. The respondent failed to surrender the client's files and papers in timely fashion, despite repeated written and oral demands and requests to do so by both the client and the subsequent attorney.
132. The client and attorney Bushell also made requests for surrendering the remaining portion of the escrowed funds.
133. The respondent failed to return to the client any portion of the escrowed funds, interplead such funds, or notify the client that the respondent intended to keep such funds and apply them to her attorney fees.
134. By such conduct, the respondent violated Colo. RPC 1.16(d).
WHEREFORE, the complainant prays at the conclusion hereof.

IV. CLAIM VII

[A Lawyer Shall Not Knowingly Make a False Statement of Material Fact or Law to a Tribunal-Colo. RPC 3.3(a)(1)]
135. Paragraphs 1 through 93 are incorporated herein.
136. Colo. RPC 3.3(a)(1) provides that a lawyer shall not knowingly make a false statement of material fact to a tribunal.
137. On February 19, 1999, the court ordered the respondent's client to immediately sign a release that had already been furnished by attorney Loper for the client's First Bank Account Records. The client did not sign such release as ordered by the court.
138. On March 15, 1999 attorney Loper filed a motion to compel discovery and to compel the client to execute releases for her first bank account.
139. The respondent filed a response to the motion to compel discovery on March 24, 1999. In the response, the respondent states that the "First Bank release has been dealt with."
140. The above statement made by this respondent to the court was false; no releases had been signed for the bank account as of the date of said response.
141. The respondent knew that the above statements made in her response were not true at the time she made such statements to the court.
142. The respondent's false statements dealt specifically with the issues raised by attorney Loper's motion to compel her client to execute the releases, and were therefore of a material fact to the court because such statements directly applied to the issue of whether or not the client had signed such releases.
143. By such conduct, the respondent violated Colo. RPC 3.3(a)(1).
WHEREFORE, the complainant prays at the conclusion hereof.

CLAIM VIII

[A Lawyer Shall Not Knowingly Disobey an Obligation Under the Rules of a Tribunal-Colo. RPC 3.4(c); In Pre-Trial Procedure, a Lawyer Shall Not Make a Frivolous Discovery Request-Colo. RPC 3.4(d)]
144. Paragraphs 1 through 93 are incorporated herein.
145. Colo. RPC 3.4(c) provides that a lawyer shall not knowingly disobey an obligation under the rules of a tribunal.
*538 146. The Colorado Rules of Civil Procedure applied to discovery matters in the Duran dissolution proceeding.
147. A domestic case management and delay reduction order was entered on November 13, 1998, requiring that case management, disclosure and discovery be conducted in accordance with C.R.C.P. 16.2 and 26.2. Discovery must also comply with C.R.C.P. 30-37. In addition, subpoenas must comply with C.R.C.P. 45. Also, C.R.C.P. 121 is applicable in dissolution matters and personal service must be established by C.R.C.P. 4.
148. The respondent's conduct involving the February 10, 1999 subpoena duces tecum (see paragraphs 11-12 above) violated the Colorado Rules of Civil Procedure and the domestic case management and delay reduction order. The respondent knew or is presumed to know of her obligations under the Colorado Rules of Civil Procedure and the case management order.
149. Despite the respondent's knowledge of her obligations under the Rules of Civil Procedure and the case management and delay reduction order, the respondent knowingly violated said rules by issuing the February 10, 1999 subpoena.
150. As a result, the Arapahoe County District Court ordered that Amy Duran and the respondent desist from any further discovery that was not conducted in compliance with the Colorado Rules of Civil Procedure. At this point, the respondent had clear knowledge that she must comply with the Colorado Rules of Civil Procedure in any further discovery.
151. Despite such clear direction by the Colorado Rules of Civil Procedure, the case management and delay reduction order, and the court's March 12, 1999 order, the respondent continued to violate these rules and orders by filing a motion to compel discovery against the opposing party Jack Duran that was not based on Dr. Duran's failure to answer any formal discovery, but was instead based on a claim by respondent that documents informally requested had not been produced. Such conduct violated Colo. RPC 3.4(c).
152. The respondent's conduct in the preparation and handling of the April 21, 1999 subpoena as above described in paragraph 23; the August 13, 1999 notice of paper deposition as above described in paragraph 27; the August 26, 1999 subpoena duces tecum as above described in paragraph 31; the September 23, 1999 subpoenas to Dr. Martinez and Lynn Kernan as above described in paragraphs 32 and 33; all violated the Colorado Rules of Civil Procedure, the case management and delay reduction order; and the court's March 12, 1999 order.
153. The respondent knew or was presumed to know, of her obligations under the Rules of Civil Procedure, case management and delay reduction order, and the March 12, 1999, court order.
154. Despite the respondent's knowledge of her obligations, the respondent knowingly violated the Rules of Civil Procedure, the case management and delay reduction order and the March 12, 1999 court order by preparing and handling all the above described subpoenas.
155. By such conduct, the respondent violated Colo. RPC 3.4(c).
156. Colo. RPC 3.4(d) provides that a lawyer shall not in pre-trial procedure, make a frivolous discovery request. The respondent's above-described conduct during the discovery portion of her client's matter constituted a frivolous discovery request under Colo. RPC 3.4(d).
157. By such conduct, the respondent violated Colo. RPC 3.4(d).
WHEREFORE, the complainant prays at the conclusion hereof.

CLAIM IX

[A Lawyer Shall Not in Trial, Assert Personal Knowledge of Facts in Issue Except When Testifying as a Witness-Colo. RPC 3.4(e)]
158. Paragraphs 1 through 93 are incorporated herein.
159. Colo. RPC 3.4(e) provides that a lawyer shall not in trial, ... assert personal knowledge of facts in issue except when testifying as a witness.
*539 160. The respondent's conduct in testifying during her cross-examination and direct-examination of witnesses involved the assertion of her personal knowledge of facts in issue at times when the respondent was not testifying as a witness.
161. The respondent's conduct required the presiding district court judge to admonish her on approximately nine occasions.
162. By such conduct, the respondent violated Colo. RPC 3.4(e).
WHEREFORE, the complainant prays at the conclusion hereof.

CLAIM X

[In Representing a Client, a Lawyer Shall Not Communicate About the Subject of the Representation With a Party the Lawyer Knows to be Represented by Another Lawyer in the Matter, Unless the Lawyer has the Consent of the Other Lawyer or is Authorized by Law to do so-Colo. RPC 4.2]
163. Paragraphs 1 through 93 are incorporated herein.
164. Colo. RPC 4.2 provides: "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."
165. On October 16, 1999, the respondent communicated with the opposing party about the subject of the representation with Dr. Duran at a local McDonald's restaurant (see paragraph 34 above).
166. On October 16, 1999, the respondent knew opposing party Dr. Duran was represented by attorney Loper in the matter.
167. The respondent did not have prior consent of attorney Loper and was not authorized by law to communicate as such with Dr. Duran on October 16, 1999.
168. By such conduct, the respondent violated Colo. RPC 4.2.
169. On January 22, 2002, the respondent again communicated about the subject of the representation with Dr. Duran (see paragraph 54 above).
170. On January 22, 2002, the respondent knew Dr. Duran was represented by attorney Loper's law firm.
171. The respondent knew on January 22, 2002 that she did not have the consent of attorney Loper or any other member of attorney Loper's law firm to speak with Dr. Duran, and was not authorized by law to do so.
172. In fact, on April 26, 1999, opposing counsel Loper had admonished the respondent to cease communicating directly with Jack Duran on matters involving either the dissolution proceeding or the unemployment compensation hearing. In addition, after the October 16, 1999 incident, attorney Loper again wrote to the respondent, admonishing her to refrain from contacting Dr. Duran personally.
173. Thus, the respondent knowingly violated Colo. RPC 4.2 despite prior admonitions not to do so.
174. By such conduct, the respondent violated Colo. RPC 4.2.
WHEREFORE, the complainant prays at the conclusion hereof.

V. CLAIM XI

[A Lawyer Shall not Engage in Conduct Involving Dishonesty, Fraud, Deceit or Misrepresentation (Knowing Conversion and Other Dishonesty)-Colo. RPC 8.4(c)]
175. Paragraphs 1 through 93 are incorporated herein.
176. Colo. RPC 8.4(c) provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.
177. On June 21, 2002, the respondent transferred funds held in escrow for the LaCrosse evaluation to her operating account.
178. The respondent made such transfer knowing that ownership of said funds was in dispute by Dr. LaCrosse and by the client.
179. The respondent did so knowing that neither the client nor Dr. LaCrosse had authorized *540 the respondent to take such funds, and knowing that her client was in bankruptcy proceedings which listed the respondent as a creditor.
180. The respondent exercised dominion or ownership over these funds held in escrow. The respondent did not have the consent of the client to use the escrowed funds for payment of attorney fees owed to the respondent, or any other purpose other than that established by the prior escrow agreement.
181. Through the unauthorized exercise of dominion or ownership over the entrusted funds as described above, the respondent knowingly converted or misappropriated funds belonging to either Dr. LaCrosse or the client.
182. Through her knowing conversion or misappropriation of escrowed funds, the respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation.
183. By such conduct, the respondent violated Colo. RPC 8.4(c).
184. The respondent also engaged in dishonesty, deceit and misrepresentation when she submitted a "July 31, 2002" billing statement in October 2002 that contained the false May 9, 2002 (see paragraph 66(b) and (c) above) and July 8 (see paragraph 84 above) entries.
185. The respondent knew these statements were false at the time she presented them in the "July 31" billing statement, in October, 2002.
186. By such conduct, the respondent violated Colo. RPC 8.4(c).
WHEREFORE, the complainant prays at the conclusion hereof.

CLAIM XII

[A Lawyer Shall not Engage in Conduct that is Prejudicial to the Administration of Justice-Colo. RPC 8.4(d)]
187. Paragraphs 1 through 93 are incorporated herein.
188. Colo. RPC 8.4(d) provides that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.
189. The respondent engaged in conduct prejudicial to the administration of justice in the following respects:
a. By her interjection into the parenting evaluation process, thereby interfering with the ability of the parenting evaluator to conduct an appropriate evaluation for the district court;
b. By her conduct in providing or suggesting answers to a client while the client was testifying on the witness stand;
c. By her conduct in testifying during her cross-examination and direct-examination of witnesses; and
d. By her failure to return the client file in a timely manner, causing delay of the process.
Each instance described above constitute a separate violation of Colo. RPC 8.4(d) as do all of them together.
190. Each of the above instances all interfered with the ebb and flow of procedures and the function of the Arapahoe County District Court in the dissolution matter.
191. By such conduct, the respondent violated Colo. RPC 8.4(d).
WHEREFORE, the complainant prays at the conclusion hereof.

THE PHILLIPS MATTER

General Allegations
192. On or about December 22, 1999, Gary Lee Phillips was charged with two counts of second-degree assault (class four felonies), and two counts of violent crimes:
a. The first count (second-degree assault) involved bodily injury to his wife of two months, Jeanne Anderson, by means of deadly weapons (a porcelain figurine and a can of olives);
b. The second count involved bodily injury to his wife's friend, Karen Hahn, by means of a deadly weapon (Clorox bleach); and
c. The third and fourth counts (violent crimes) related to the same incidents involving Ms. Anderson and Ms. Hahn.
*541 On December 23, 1999 Jeanne Anderson filed a dissolution of marriage proceeding against Mr. Phillips, In re: the Marriage of Anderson and Phillips, 99DR3758, Jefferson County District Court.
193. Mr. Phillips had originally been represented by attorney Michael A. Cohen and Thad Oviatt in both the criminal matter and the dissolution matter.
194. On August 29, 2000, Mr. Phillips had an initial consultation with the respondent about a possible substitution as counsel of record in both the criminal matter and the dissolution matter. At that time, the respondent gave Mr. Phillips a proposed fee agreement to take home, review and return if he chose to accept that agreement.
195. At the initial consultation, the parties had not discussed the use of property as collateral.
196. The respondent charged Mr. Phillips $600 for the initial consultation. Mr. Phillips paid the $600 that day.
197. The fee agreement was signed by both Mr. Phillips and the respondent on August 31, 2000.
198. The fee agreement covered all legal services provided by the respondent, including the criminal matter and the dissolution matter.
199. The fee agreement provided that the respondent would receive $175 per hour for legal services. Mr. Phillips was required by the agreement to pay an initial retainer fee of $50,000.
200. The signed fee agreement also contained the following language in the respondent's hand writing along the margin of the first page, that was added on August 31, 2000:
[GP, GG initials] by 9-6-00 $10000 + Title/Lien to 17677 E. Loyola Dr. # F Aurora Co. 80013 valued at 65,000 + with a current lien of approx. $44,000 leaving equity of $25,00030,000 Client to Provide comps [and] Title w/Lien/Deed of Trust to Mrs. Gifford Client to Provide additional $10,000 Collateral on or before 9-6-00 if comps don't cover the full retainer [GG GP initials] (sic)
Attny agrees to allow client to purchase/pay off legal costs to reacquire collateral by formal agreement. [GG, G.P. initials] (sic)
A copy of the first page of this fee agreement is attached to this complaint as Exhibit 1.
201. This signed fee agreement contemplated that the respondent would take a security interest, and that Mr. Phillips would provide a security interest. While the respondent addressed other ethical considerations in this fee agreement with her client,[2] the respondent did not address Colo. RPC 1.8(a) issues.[3]
202. An attorney client relationship commenced on or before August 31, 2000 between the respondent and Mr. Phillips, thereby forming an obligation on the part of respondent to perform the agreed-upon services. By agreeing to perform such services, the respondent inherently represented that she would provide the services in accordance with the Colorado Rule of Professional Conduct.
203. The respondent did not advise Mr. Phillips to seek independent counsel regarding the new language involving the supply of title to and/or a lien on the real property, or use of the real property as collateral.
204. While the August 31, 2000 agreement contemplated the creation of a contractual lien, the August 31 agreement did not create a contractual lien.
*542 205. Mr. Phillips did not provide title to, or a lien on, the property by September 6, 2000, and thus no contractual lien was subsequently created.
206. The respondent entered her appearance in the criminal matter on September 12, 2000. The respondent filed a motion to continue the December 12-15, 2000 trial date. The motion to continue the trial date was granted, and the criminal matter was continued to April 24-30, 2001.
207. The respondent also entered her appearance in the dissolution matter, and moved for a continuance of the permanent orders hearing. The permanent orders hearing set for November 14-15, 2000 was continued to July 10-12, 2001.
208. Civil lawsuits were subsequently filed by Ms. Anderson and Ms. Hahn against Mr. Phillips. The respondent started to represent Mr. Phillips on these matters. The respondent filed a counter-suit in the Hahn matter. No new fee agreement was entered into. The respondent combined billings on these personal injury defense matters into the same combined billing for the criminal matter and the dissolution matter.
209. On January 29, 2001, the respondent took the deposition of Jeanne Anderson in the dissolution matter. During the noon break from that deposition, the respondent counselled Mr. Phillips to give the marital residence located at 17655 W. 44th Avenue, Golden, Colorado in exchange for a possible agreement that the wife, Jeanne Anderson, recant her testimony to the district attorney in the criminal trial. The respondent has admitted:
... during the noon break, I felt it was my duty to ask my client if he would consider a settlement if, under some scenario, Jeanne would accept the house and withdraw her many, many false statements that she had made to the police.
* * *
I went on ad nauseam about how much I knew he was really opposed to losing the house; about how much equity he had in it; that one-half of it was probably going to Jeanne under the divorce; that he might want to weigh the possibility of ten years in Canyon (sic) City against the $125,000 share he would have in the house; the extensive legal cost still ahead of him, etc. I told him to go on to lunch and to not answer me at that time, just think about it and that I could not assure him that even if he wanted to make the offer that it would be accepted. We agreed that all Jeanne really wanted, from the beginning of his relationship with her and throughout their short marriage and the events subsequent, was money. I suggested that if she would recant the false accusations, then maybe he would not be facing jail time. I advised him that vis a vis Jeanne, I was pretty comfortable that I had her impeached; however, we had a different problem with the other victim.
210. Phillips taped a subsequent February 8, 2001 conversation between the respondent and him in which this issue was further discussed. In that taped conversation, the respondent discussed Jeanne recanting her testimony, and instead saying that she (Jeanne) didn't see "it" accurately or in fact that she had started or provoked "it"; and that "the document" be exchanged at the same time between the parties to ensure that he was giving her the house. The respondent concluded with the statement:
It doesn't, its not as as clean as a whistle but it is ... it has a higher probability of of being done if you're sitting at a little closing table and you're saying ... uh well... I want to see a document that recants and it has to be a document satisfactory to me that the ... that the DA would not pursue Mr. Phillips and which is in, if all you really want Jeannie, is money take your GD money and run away....
211. The relationship between the respondent and the client deteriorated rapidly in March 2001. The respondent filed a motion to withdraw from representation in the criminal matter on March 9, 2001. The respondent appears to have filed a motion to withdraw from the dissolution matter by facsimile transmission in March, 2001; that motion to withdraw (if received) was not placed into the court file. (Nevertheless, both the *543 respondent and Mr. Phillips considered the relationship terminated in March, 2001).
212. On March 22, 2001, the respondent recorded a "Notice and Claim of Lien" with the Arapahoe County Clerk and Recorder's Office. A copy of that notice and claim of lien is attached hereto as Exhibit 2. The respondent claims a lien in that document in the amount of $40,000. The respondent had not filed a notice of lien in either the dissolution matter or the criminal matter.[4]
213. The property that the respondent liened was 17677 E. Loyola Drive, Aurora, CO. 17677 E. Loyola Drive is an address shared by six different town houses, all with different owners. The different town houses are designated by letters A-F. Only unit # F was marital property owned by Phillips and Anderson. Since the respondent liened the address of 17677 E. Loyola Drive without specifying a specific house letter, the lien was against all of these properties.
214. While the respondent claimed $40,000 as amounts owing under the lien, the respondent's combined billing statements for the criminal matter, the dissolution of marriage matter, and the personal injury matters demonstrate that at the time of filing the lien (on March 22, 2001 and after moving to withdraw), the client only owed the respondent $28,542.87. The respondent's billing statements combined billings for all of these different legal matters into one.
215. The respondent filed such charging lien even though the criminal matter and the personal injury matters that were part of the subject of her legal representation did not involve obtaining this real property or any other property or proceeds for the client.
216. On March 27, 2001 attorney Arthur S. Nieto entered his appearance on behalf of Mr. Phillips in the criminal matter. Mr. Nieto attempted to contact the respondent by telephone so that he could obtain a copy of the client files from the respondent, but was unsuccessful.
217. A hearing in the criminal matter occurred on March 28, 2001. At that hearing, attorney Nieto entered his appearance and the respondent moved to withdraw. The district attorney had no objection to the respondent's motion to withdraw if the motions hearing date (April 19, 2001) and the trial date (April 24-30, 2001) were not affected. The court allowed Mr. Nieto to enter his appearance and the respondent to withdraw. The court affirmed that new or supplemental motions had to be filed by April 9, 2001.
218. The court further stated on the record:
Ms. Gifford, as part of your responsibility in conjunction with your withdrawal, I want to ensure that you have delivered to... Mr. Nieto everything in your file, including he has all these motions.
The respondent responded: "I've given them all to Mr. Phillips as well, your honor."
219. The respondent had not provided the client files to either Mr. Phillips or Mr. Nieto at the time she made this statement. The respondent did not thereafter timely provide these client files to Nieto or the client.
220. On April 2, 2001 Mr. Nieto called the respondent's office to get the files, and learned from a voice mail message that the respondent was out of her office from March 30, 2001 until April 9, 2001. The respondent had not informed Mr. Nieto or the court that she would be unavailable during this time period, and made no prior arrangements for the files. Nieto was able to contact the respondent's assistant, Martha, on that same day; Martha told him she had no authority to make the files available. Thus, Mr. Nieto was forced to photocopy the court file in his attempts to adequately represent his client's interests and to comply with court deadlines for the upcoming trial.
221. On April 5, 2001 Nieto faxed and mailed a letter to the respondent asking that she provide a copy of the client files immediately. Respondent received this letter. Respondent did not respond.
*544 222. On April 6, 2001, Nieto called the respondent's office and learned the voice mailbox was full. Thus, Mr. Nieto could not leave a message.
223. On April 9, 2001 Mr. Nieto filed a motion for enlargement of time within which to file or supplement motions on behalf of his client based upon his inability to begin, much less complete, the research and investigation necessary to draft or supplement motions, due to the respondent's failure to provide the client files.
224. On April 12, 2001 Mr. Nieto was finally able to make phone contact with respondent. At that time, the respondent informed Mr. Nieto that she was unwilling to tender the files because Mr. Phillips owed her money. Nieto reminded her that the court had ordered her to supply the files. The respondent argued that the court did not order her to do so, but instead only commented that the parties could arrange for the files to be turned over.
225. On April 17, 2001 Mr. Nieto filed a motion to continue the trial and motions hearing and for an order that the respondent appear and show cause why she should not be sanctioned by the district court for obstructing the defendant's efforts to become prepared for trial by failing to deliver the client files. Nieto described his independent efforts to obtain discovery from the court, the client, the D.A. and other parties. Nieto also disclosed that the respondent had original photographs, deposition transcripts and expert witness materials, all of which were crucial to his handling of his client's matter.
226. April 19, 2001 was the scheduled date for the motions hearing in the criminal matter. The respondent was present. At that hearing, the deputy district attorney expressed dismay from her standpoint, and both victims' standpoints, regarding another continuance in the criminal matter, but also acknowledged that attorney Nieto had done everything he could to get the files from the respondent and to prepare for the motions hearing and trial.
227. The court granted the motion to continue the trial and motions hearing for the reasons set forth in Nieto's motion. The court reminded the respondent that she had informed the court on March 28 that she was going to give everything in her file pertaining to this case to the client and Nieto. The respondent did not deny the court's statement but instead only argued that she hadn't been paid by the client.
228. The court then clearly and specifically ordered the respondent to turn over the respondent's files in the criminal matter to Nieto, this time by Saturday, April 21, 2001 at noon.
229. The respondent did not provide the client files by that deadline, but did provide the client files on the criminal matter on April 25, 2001.
230. The respondent would not provide the files in the dissolution matter or the civil lawsuit matter at that time. Later that day, however, the respondent wrote a letter directly to her former client Gary Phillips, and not copied to attorney Nieto, in which she instructed the former client to contact her on Thursday, April 26, 2001, so that she could arrange delivery of the dissolution files and the two civil suit files.
231. In the above letter, the respondent also made the following statements:
Your focus has been excessively, in my opinion, on impeaching Jeanne. I told you over and over again that, in my opinion, we had more than enough to impeach Jeanne. (Karen Hahn was another matter). I hoped you would at least discuss settlement because there was a possibility that Jeanne could/would talk Karen into taking a piece of the house and, if they would recant their claim that you intentionally assaulted them, you would have a higher probability that the D.A. would drop the charges or let you plead to a much lesser offense. There is, of course, no guarantee that Jeanne or Karen, or, the D.A. would go along with anything. Jeanne certainly hates you, and as I told you, she is applying great pressure to the D.A.
232. The client requested that respondent provide the files to Nieto. In a facsimile transmission dated May 3, 2001 but not sent until May 7, 2001, the respondent stated that *545 she would prepare all of the remaining client files for transport to Nieto. Despite such statement, the respondent failed to provide these files to Nieto.
233. On May 14, 2001 a hearing on a motion for contempt filed by the wife and against Phillips in the dissolution matter was scheduled before Magistrate DeVita in Division S of the Jefferson County District Court. Nieto entered a limited appearance therein based on the fact that, as of the date of the show cause hearing, the respondent had neither filed nor prosecuted a motion to withdraw, nor transmitted the client file in the dissolution matter to Nieto, despite many requests.
234. The magistrate had his clerk call the respondent and ordered her to file a motion to withdraw. Because the underlying motion for contempt involved documents that had not been produced to counsel for the wife, the magistrate suggested that a show cause order be prepared that would require the respondent to produce the documents. The magistrate further stated:
I have had previous dealings with this attorney and I understand your quandary and your wondering and your hearing noises about one particular thing but nothing definite. Been there and done that. And that's why I would go to the extent of offering show cause for her to appear and tell me why this should not happen and why she's delaying the court process.
235. The show cause hearing in the underlying contempt matter was rescheduled to June 20, 2001. Nieto subsequently notified the respondent that Magistrate DeVita was disposed to issuing an order to the respondent requiring her personal appearance to show cause why she should not be held in contempt for her failure to turn over the files in the dissolution matter.
236. Nieto advised the respondent that he would draft and file the contempt papers by the end of that day in the event the respondent had not made good on her representation that she would transport the files to him. Nieto emphasized that he hoped he would not have to go to the expense and waste of time to do so, but that he was left with few alternatives.
237. Subsequently[5], the respondent turned over the remaining files to Nieto.
238. On May 16, 2001 the respondent filed a motion to withdraw from the dissolution matter (dated March 16, 2001, with a certificate of mailing to opposing counsel dated March 19, 2001). The court granted the respondent's motion to withdraw on May 18, 2001.
239. Nieto entered his appearance in the dissolution matter on June 25, 2001, and got a continuance for the July permanent orders hearing.
240. Mr. Phillips was subsequently convicted on or about September 14, 2001 on the criminal charges, and received six years in the Colorado Department of Corrections on convictions for counts one and two.
241. The permanent orders hearing in the dissolution matter occurred on October 31 and November 1, 2001, and a decree of dissolution and permanent orders were entered.
242. Attorney Nieto was required to acquire a judgment against Mr. Phillips for nonpayment of his attorney fees in the dissolution of marriage action. When attorney Nieto attempted to file a lien, he learned that the respondent had filed her March, 2001, charging lien.
243. Attorney Nieto wrote the respondent on March 22, 2002, informing her that the recording of such lien was improper citing C.R.S. § 12-5-119 and In re the Marriage of Mitchell, 00CA0396 [55 P.3d 183] (Colo.App.2002). The respondent has not released the lien as of December, 2002.

CLAIM XIII

[A Lawyer Shall Provide Competent Representation To A Client-Colo. RPC 1.1]
244. Paragraphs 192 through 243 are incorporated herein.
*546 245. Colo. RPC 1.1 provides that a lawyer shall provide competent representation to a client, and that competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.
246. The respondent failed to provide her client competent legal representation when she advised her client that he should give his ex-wife the marital residence in exchange for the ex-wife (and possibly the other victim, Karen Hahn) recanting their prior statements on the assault incident.
247. The respondent failed to fully consider and then discuss with her client the potential for violating C.R.S. § 18-8-703 (bribing a witness) and/or § 18-8-707 (tampering with a witness) if the respondent and/or the client made such offer to the wife or her attorney in the dissolution matter. See People v. Aron, 962 P.2d 261 (Colo.1998) (attorney was disciplined for failing to tell a client that keeping the client's children in violation of the custody order could result in a felony charge, and also failed to tell the client that another state would not assume jurisdiction if the children were in that state in violation of the custody order).
248. The client refused to accept the respondent's advice to offer the marital residence in exchange for the wife recanting her testimony to the district attorney in the criminal trial. Thus, no actual harm was suffered. Nevertheless, the respondent's advice on this issue had a potential for creating potentially serious harm to this client.
249. By such conduct, the respondent violated Colo. RPC 1.1.
WHEREFORE, the complainant prays at the conclusion hereof.

CLAIM XIV

[A Lawyer Shall not Counsel a Client to Engage in Conduct that the Lawyer Knows is Criminal-Colo. RPC 1.2(d)]
250. Paragraphs 192 through 243 are incorporated herein.
251. Colo. RPC 1.2(d) provides that a lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of action with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.
252. The respondent provided legal advice to her client where she attempted to influence him to give the marital residence in exchange for the wife recanting her testimony to the district attorney in the criminal trial.
253. The respondent knew at the time she provided this advice that Jeanne Anderson and Karen Hahn were primary witnesses in the criminal matter. The respondent knew or should have known that offering real property in exchange for a recant of testimony had the potential for violating C.R.S. § 18-8-703 (bribing a witness) and/or § 18-8-707 (tampering with a witness) if the respondent and/or the client made such offer to the wife or her attorney in the dissolution matter.
254. The respondent knew such conduct was illegal as she had previously discussed this issue with her client in August 2000 and had discouraged him from following that course of conduct at that time, as she considered such conduct illegal.
255. The respondent counseled her client to engage in conduct that the lawyer knew was criminal. Such advice was not simply discussing the legal consequences of her proposed course of action and was not done in a good faith effort to determine the validity scope meaning or application of the law.
256. By such conduct, the respondent violated Colo. RPC 1.2(d).
WHEREFORE, the complainant prays at the conclusion hereof.

CLAIM XV

[Conflict of Interest: Prohibited Transactions-Colo. RPC 1.8(a)]
257. Paragraphs 192 through 243 are incorporated herein.
*547 258. Colo. RPC 1.8(a) provides that a lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless (1) the transaction and terms on which the lawyer acquires the interest are fair an reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client; (2) the client is informed that use of independent counsel may be advisable and is given a reasonable opportunity to seek the advice of such independent counsel in the transaction; and (3) the client consents in writing thereto.
259. The respondent entered into an agreement with her client whereby the client would provide title and/or a lien and/or a deed of trust to the respondent as "collateral" for the attorney-client fee agreement.
260. The respondent failed to disclose to the client the ramifications of providing the security interest in the property, and failed to transmit such disclosure in writing in a manner that could be reasonably understood by the client.
261. The respondent failed to inform the client that use of independent counsel may be advisable, and failed to provide the client a reasonable opportunity to seek the advice of such independent counsel.
262. The respondent failed to obtain a written consent to the conflict disclosure required under this rule.
263. The respondent had the obligation to be certain that her client was made aware of the protections under Colo. RPC 1.8(a), but failed to discharge that obligation.
264. By such conduct, the respondent violated Colo. RPC 1.8(a).
WHEREFORE, the complainant prays at the conclusion hereof.

CLAIM XVI

[Upon Termination, a Lawyer Shall Take Steps to Protect a Client's Interest and Surrender Papers and Property to the Client-Colo. RPC 1.16(d)]
265. Paragraphs 192 through 243 are incorporated herein.
266. Colo. RPC 1.16(d) provides that upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interest, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled, and refunding any advance payment of fee that had not been earned.
267. The attorney-client relationship was effectively terminated by the parties in March, 2001.
268. On March 27, 2001, attorney Arthur S. Nieto entered his appearance on behalf of Mr. Phillips in the criminal matter. Time was of the essence in ensuring that this client's interests in the criminal matter were protected.
269. Mr. Nieto attempted to obtain a copy of the client files from the respondent in timely fashion.
270. The respondent failed to surrender the client files and papers despite numerous demands and requests to do so. The court ordered the respondent to produce the client files.
271. The respondent failed to comply with the court order to surrender the client files and papers in timely fashion.
272. By the above-described conduct, the respondent failed to take steps to protect the client's interests in the criminal matter, causing a continuance of the criminal trial. Furthermore, the respondent's conduct could have potentially caused serious harm to the client had the criminal trial not been continued due to the respondent's failure to provide the files and papers.
273. Attorney Nieto also made requests for the client's dissolution files from the respondent.
274. The respondent failed to surrender these client files and papers despite demands and requests to do so.
275. The respondent's conduct in failing to surrender the dissolution files occurred *548 over a period of time, and eventually required intervention by the court.
276. Only after the respondent was threatened with contempt action did the respondent turn over the dissolution files to Nieto.
277. The respondent's conduct in failing to return the dissolution files caused harm or potentially serious harm to the client.
278. By such conduct, the respondent violated Colo. RPC 1.16(d).
WHEREFORE, the complainant prays at the conclusion hereof.

VI. CLAIM XVII

[A Lawyer Shall Not Engage in Conduct Involving Dishonesty, Fraud, Deceit or Misrepresentation-Colo. RPC 8.4(c)]
279. Paragraphs 192 through 243 are incorporated herein.
280. Colo. RPC 8.4(c) provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.
281. On March 22, 2001, the respondent recorded a "notice and claim of lien" with the Arapahoe County Clerk and Records Office.
282. The respondent asserted a lien in the amount of $40,000.
283. At that time the respondent filed said lien, the respondent knew that her representation of this client had ended, and knew that the client only owed her $28,542.87 as she had just prepared a contemporaneous billing statement for this client.
284. Nonetheless, the respondent filed the notice of claim of lien that contained the language: "client has incurred legal costs at or near the remaining balance due of $40,000," when the client only owed the respondent $28,542.87.
285. This statement made in a recorded document affecting real estate was not true, and overstated even her own records by $11,000.
286. As stated above, the respondent knew this statement was not true at the time she made such statement.
287. By providing this false information to a government agency and recording the same, the respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation.
288. By such conduct, the respondent violated Colo. RPC 8.4(c).
WHEREFORE, the complainant prays at the conclusion hereof.

CLAIM XVIII

[It is Professional Misconduct for a Lawyer to Engage in Conduct that is Prejudicial to the Administration of Justice-Colo. RPC 8.4(d)]
289. Paragraphs 192 through 243 are incorporated herein.
290. Colo. RPC 8.4(d) provides that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.
291. The respondent failed to deliver to her client or the successor attorney all papers and property to which the client was entitled.
292. The respondent knew of the upcoming deadlines in both the criminal matter and the dissolution matter at the time she refused to deliver these files.
293. The respondent attempted to use the upcoming deadlines to leverage her client into paying her additional attorney fees.
294. The respondent's conduct in failing to surrender these files caused delay and other potentially serious injury in both proceedings, and interfered with the ebb and flow of justice, by causing unnecessary continuances.
295. Such conduct is prejudicial to the administration of justice.
296. Such conduct violates Colo. RPC 8.4(d).
297. The respondent also recorded a charging lien on client property.
*549 298. The respondent knew at the time she filed said lien that such lien was improper, and was subsequently told that said lien was improper.
299. Despite such knowledge and notice, the respondent has failed and refused to release said charging lien.
300. This conduct had and continues to have the potential of interfering with real estate transactions on these properties without any justification or basis.
301. By such conduct, the respondent violated Colo. RPC 8.4(d). See People v. Smith, 830 P.2d 1003 (Colo.1992).
WHEREFORE, the complainant prays at the conclusion hereof.

CLAIM XIX

[It is Professional Misconduct for a Lawyer to Engaging in Any Other Conduct That Adversely Reflects on the Lawyer's Fitness to Practice Law-Colo. RPC 8.4(h)]
302. Paragraphs 192 through 243 are incorporated herein.
303. Colo. RPC 8.4(h) provides it is professional misconduct for a lawyer to engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.
304. On March 22, 2001, the respondent recorded a "notice and claim of lien" with the Arapahoe County Clerk and Recorder's Office.
305. That lien was improper and excessive for the following reasons:
a. The lien was for an amount in excess of the respondent's legal fees in all matters;
b. The respondent had no contractual lien;
c. The respondent was not entitled to assert a charging lien on property for the criminal matter or the personal injury matters, as the property was not a basis of the litigation in either of those matters. See C.R.S. § 12-5-119 (2001);
d. The respondent failed to obtain a judgment in either the underlying dissolution matter or a separate proceeding. See People v. Smith, 830 P.2d 1003 (Colo.1992) and In re the Marriage of Mitchell, 55 P.3d 183 (Colo.App.2002).
e. The respondent also created a cloud on title for the other five homeowners at this address, and has failed to correct the situation to date.
306. The totality of the above conduct demonstrates that this respondent lacks the personal or professional ethical qualifications required of those individuals authorized to practice law, and violates every notion of client trust and of fair and efficient dealing.
307. The respondent ignored statutory and case law, the rights of her client (to whom she owed a duty of loyalty) and the rights of third party homeowners in an overreaching attempt to leverage payment of her asserted fees, plus an extra $11,000.
308. Such conduct adversely reflects on the respondent's fitness to practice law.
309. By such conduct, the respondent violated Colo. RPC 8.4(h).
WHEREFORE, the people pray that the respondent be found to have engaged in misconduct under C.R.C.P. 251.5 and the Colorado Rules of Professional Conduct as specified above; that the respondent be appropriately disciplined for such misconduct; that the respondent be required to refund fees to Amy Szot, and/or the client protection fund pursuant to C.R.C.P. 252.14(b), and/or provide restitution to third parties; that the respondent release the lien filed with the Arapahoe County Clerk and Recorder's Office; that the respondent be required to take any other remedial action appropriate under the circumstances; and that the respondent be assessed the costs of this proceeding.
Dated this 27th day of January, 2003.
NOTES
[1] The Colorado Attorney Fund for Client Protection reimbursed Duran and Campanella Kortobi.
[2] The respondent's fee agreement discussed issues involving attorney/client privilege, confidentiality, communication and abuse of after-hours access to the respondent, and matters involving termination of representation.
[3] Colo. RPC 1.8(a) allows lawyers to take a security interest in client property for payment of fees if the terms of the transaction are fair and disclosed in writing, the client is informed that independent counsel is advisable, and the lawyer obtains written consent from the client. The client may not understand the ramification of providing a security interest in property owned by the client or in which the client has an interest. It is the lawyer's responsibility to be certain the client has been made aware of protection under Colo. RPC 1.8(a). See CBA formal ethics opinion 110 (adopted January 19, 2002).
[4] In fact, the respondent would have no right to file a notice of lien on property in the criminal matter.
[5] None of the participants remembers the date the respondent finally turned over the files, other than it occurred after Nieto's May letter.